**Carlyn J. MORAN and James J. Moran, Respondents,**

v.

**BOARD OF DIRECTORS, SCHOOL DISTRICT OF KANSAS CITY, Missouri, Appellants.**

**No. 30064.**

Missouri Court of Appeals, Western District.

June 29, 1979.

Edward T. Matheny, Jr., Shirley Ward Keeler, Kansas City, for appellants.

John J. Kitchin, Lawrence M. Maher, Kansas City, for respondents.

Before HIGGINS, Special Judge, Presiding, and SWOFFORD, C. J., and WELBORN, Special Judge.

## ANDREW JACKSON HIGGINS, Special Judge.

Appeal from judgment which reversed assignment by the Kansas City School District of Karlin Moran, a handicapped child, for special education purposes, pursuant to ¶¶ 162.670, et seq., RSMo Cum.Supp.1973; and which awarded her parents $6,477 for services for the child at a private institution. The question is whether the court exceeded the scope of judicial review of the District's administrative decisions. Reversed.

Karlin Moran, born June 27, 1962, was enrolled in first grade at J. C. Nichols Elementary School September, 1969. After subjective evaluation by her teacher and school principal, the principal recommended to the District's Department of Special Education that she be considered for placement in a special class for educable mentally retarded students. A team of evaluators and psychiatrists reviewed her record, interviewed her, and administered her the Stanford-Binet Intelligence Test. Her I.Q. test of January 28, 1970, showed her in the range of educable mentally retarded persons, and it and other evaluations resulted in her placement in January, 1971, in a special education class for mentally handicapped children at Marlborough Elementary School. While at Marlborough, upon suggestion of her teacher, Karlin was sent by her parents to Menorah Medical Center for further evaluation and assistance. Reports from Menorah were consistent with the records and evaluations of the District with respect to her intelligence level and learning problems, and indicated progress at a rate consistent with expectations.

¶¶ 162.670, et seq., RSMo, were enacted in 1973, "to provide or to require public schools to provide to all handicapped and severely handicapped children * * * special educational services sufficient to meet the needs and maximize the capabilities of handicapped and severely handicapped children. * * * To the maximum extent practicable, handicapped and severely handicapped children shall be educated along with children who do not have handicaps and shall attend regular classes. Impediments to learning and to the normal functioning of such children in the regular school environment shall be overcome whenever practicable by the provision of special aids and services rather than by separate schooling for the handicapped". Effective July 1, 1974, "the responsible * * school district * * * shall notify[1] * * every parent or guardian of every child diagnosed, evaluated, reevaluated or assigned under the provisions of sections 162.-670 to 162.995 of the results of any diagnosis, evaluation or reevaluation made pursuant to the terms of sections 162.670 to 162.-995 and of the recommended assignment, change in assignment or denial of assignment of the child to. a class or program provided under sections 162.670 to 162.995".

Prior to July 1, 1974, the Kansas City School District reevaluated its educable mentally retarded students every three

---

1. The notice section, 162.945, was amended in 1977, to specify the manner of notice.

years and oftener if requested by teacher or parent. The reevaluation consisted of individual testing through Dr. Verburg's [2] office together with recommendations and evaluations of teachers. Karlin was reevaluated under this practice February 23, 1973, again found in the educable mentally retarded range, and continued at Marlborough.

In early 1974, Mrs. Moran and Miss Farrell [3] discussed Karlin's situation, particularly with respect to the possibility of moving Karlin from Marlborough. Miss Farrell advised that the District had no other program for Karlin on the basis of what was known about her, but could possibly move her into another program for the mentally handicapped at a different location. In August, 1974, after the new Special Education Services Act became effective, Karlin's parents were notified by letter that Karlin would be continued at Marlborough. There was no request for a hearing or other challenge by Mr. and Mrs. Moran with respect to this placement.

On October 14, 1974, believing themselves advised by Karlin's teachers [4] to look elsewhere for help, Mr. and Mrs. Moran removed Karlin from Marlborough and enrolled her in the Joan Davis School for Special Education, a private institution, whose program they felt better suited their daughter. On November 4, 1974, Mr. Moran wrote to Miss Farrell to request "tuition assistance" [5] for Karlin at Joan Davis where tuition was $254 per month. Miss Farrell responded December 2, 1974, that "before any assessment may be made of the possibility of school district assumption of tuition expense for Karlin, we must have evaluative material regarding her educational needs"; and that upon receipt of any such records "we will review Karlin's needs as to an appropriate educational program and de-

cision will be taken as to placement". Karlin continued at Joan Davis through the 1974–1975 term with progress at a level similar to her progress at Marlborough. Mr. Moran renewed his request for assistance by letter of February 7, 1975.

On August 21, 1975, Miss Farrell wrote Mr. Moran to confirm a recent telephone conversation with respect to Karlin's placement for the 1975–1976 term, and to review recommendations made by the District's Special Education Placement Committee. The recommendation of the Committee, after reviewing all records on Karlin, including those furnished by Mr. and Mrs. Moran, was that "Karlin could benefit from our Special Education Services provided at Bingham Junior High School, the junior high school of your district. Karlin * * would be given supportive help also by our Learning Disabilities teacher * * * and would be programmed into some of the Fine Arts, Practical Arts, and Physical Education classes offered to all students at Bingham * * *". The letter of assignment of Karlin to Bingham was enclosed. It recited the evaluations and assignment, and notified the parents of their entitlement "to a hearing on the action advised of in this letter".

On August 25, 1975, Mr. Moran wrote Miss Farrell to request a hearing with her and her staff, and expressed his desire to "appeal this action" and to keep Karlin at Joan Davis.

On September 24, 1975, Mr. Richard Norris, Principal at Bingham, Mrs. Betty Arnoldy of the Special Education Placement Committee, and Mr. Moran met at Bingham School to discuss the program previously proposed for Karlin. The District Administration thought of this meeting as an informal statutory hearing; Mr. Moran believed

2. Dr. Wallace A. Verburg, head of Psychological Services in the Kansas City School District.

3. Marjory Farrell, District Coordinator, Special Education.

4. Bobbie Wedlan, Karlin's teacher at Marlborough, 1971–1972, and Sandy Reed, her teacher in 1972–1973.

5. ¶ 162.705 of the Art. provides that if no program for handicapped children is available to a school district, such district may contract with non-profit organization which have programs meeting the standards set by the State Board of Education.

himself informed that this was not a "hearing". In either event, Karlin's program was discussed, and Mr. Moran was informed that the program evolved from Karlin's records. The District's position was that the Bingham assignment, including a learning disabilities program, rendered improvident any consideration of tuition for Karlin at Joan Davis School. Mr. Moran furnished additional materials by letter of September 26, 1975. On October 10, 1975, Mr. and Mrs. Moran were advised by letter from Marjory Farrell that the District's conclusions from the discussion of September 25, 1975, was to have her enrolled in the program at Bingham.

On November 22, 1975, Mr. and Mrs. Moran, through their attorney, requested the hearing provided by law. This request was not timely, due, it seems, to the confusion surrounding the nature of the meeting of September 24, 1975. In any event, the District accorded the statutory hearing on the assignment to Bingham made by the District for Karlin for the school year 1975–1976. The hearing took place January 6, 1976, before Mr. Nathan Roitman, an attorney, Hearing Officer, Department of Public Service. Mr. and Mrs. Moran were present with counsel; Dr. Clyde Baer, specialist in Research and Program Evaluation, presented the case for the District. Witnesses were sworn; testimony was taken and transcribed.

The foregoing was developed from the testimony of witnesses. James Moran, Carlyn June Moran, Dr. William Norton, and Michael Kirkpatrick, for the parents; Marjory Farrell, Marshan Field, Betty Arnoldy, Dr. Wallace Verburg, Richard Norris, and Dr. Elizabeth Weimer, for the District; and exhibits consisting of correspondence reports, and test results. Additional evidence follows.

William D. Norton, Ph.D., was a staff psychologist at Joan Davis School. He evaluated Karlin as working about a year below grade in reading and three or four years below grade in arithmetic and comprehension. He was familiar with her scores on several psychological tests, and found her in the category, Educable Mentally Retarded. He recommended prescriptive teaching, and felt she would profit from spending part of her academic day in a normal classroom.

Michael Kirkpatrick was the Executive Director of the Joan Davis School. At Joan Davis all students are in special education without exposure to "normal" students. One element in prescriptive planning available to Karlin at Joan Davis and not available in the District program was psychotherapy. He was of the opinion Karlin might be threatened by contact with normal children in regular classes.

Marshan Fields, a member of the District's Special Education Diagnostic Team and a teacher of educable mentally retarded students reviewed Karlin's school and Miss Wedlan's letter and felt Karlin had responded to the program provided her at Marlborough.

Betty Arnoldy, also a member of the District's Special Education Diagnostic Team, was a certified psychometrist and had worked at Menorah Medical Center and in the Department of Children's Learning Disabilities, doing psychological and educational testing. She studied evaluations in Karlin's file and found she was an educable mentally retarded child in need of a special education class. In her opinion, the program at Bingham was appropriate for her. She was not able to say what help Karlin might get with her hearing problem.

Dr. Wallace Verburg stated that his department's testing and Dr. Norton's tests all place Karlin in the middle of the educable mentally retarded count. He found nothing in Dr. Norton's reports to contradict his own findings. He found Karlin's visual and auditory problems to be secondary and incidental to her retardation. He attributed her suggested emotional disorders to her adolescence. He disputed Miss Wedlan's view of learning disability. The most appropriate program in his view was "to have her with a group where she is instructed in accordance with her ability level. That could be in a class for the mentally retarded as those classes are con-

ceived * * * this is better done in a public school situation than apart from the public school where all of the children are * * * of that similar handicapped condition".

Richard Norris explained that when a child is enrolled in the EMR program at Bingham, the administration meets with the counselor, parents and teachers to determine to what extent it is best to "mainstream" the individual student. "* * * most of the students in the mentally handicapped room now are having an hour of physical activity a day. They are working in shops, homemaking rooms, music, art rooms, some * * * in academic classrooms where they are able to handle it. We mainstream whenever we can". In his judgment the District program at Bingham was compatible with Karlin's needs.

Elizabeth Weimer, Ph.D., advised that the District has personnel in its Special Education Department to assist students with auditory and visual perception problems. She had served on the Placement Committee in Karlin's case and she agreed that Karlin's major problem was mental retardation with other problems secondary and that the Bingham program was appropriate for Karlin.

The Hearing Officer framed the agreed issues:

(1) Is Karlin Moran, in fact, a handicapped child as defined by Missouri Statute 162.675? (Handicapped Children, children under the age of twenty-one years who have not completed an approved high school program and who, because of mental, physical, emotional or learning problems, require special educational services in order to develop to their maximum capacity").

(2) Is there a clear recommendation for remediation?

(3) Has the School District of Kansas City, Missouri the capabilities for carrying out the recommendations?

(4) If not, is there present in Kansas City a private agency with the capability?

The Hearing Officer found:

(1) Karlin Moran is in fact a child handicapped under Missouri Statute 162.-675 and is eligible for Special Education Services pursuant to Missouri Statute 162.680.

(2) The Joan Davis School for Special Education offers little that is unique in Special Education services for this child.

(3) That the Joan Davis School offers to Karlin Moran one service only, not available in the schools of the Kansas City, Missouri School District viz the services of a professional staff psychologist.

(4) That this service is secondary to Karlin Moran's handicap and disability, and serves no crucial educational purposes.

(5) That the crux of the handicap applicable to Karlin is her mental retardation.

(6) That all evaluations are in basic agreement in regard educational needs of Karlin.

(7) That the School District of Kansas City, Missouri has the capabilities for implementing the recommendations of all evaluations and diagnoses.

The Hearing Officer recommended denial of the Joan Davis placement and attendant tuition reimbursement sought by Mr. and Mrs. Moran, and approval of the placement at Bingham made by the District for Karlin Moran. The Board of Directors of the School District accepted such recommendation February 3, 1976. Mr. and Mrs. Moran petitioned for administrative review pursuant to ¶¶ 162.965, 536.100, 536.110 RSMo, and Rules 100.03 and 100.04, March 2, 1976. The case, designated CV 76–1326, remained undecided as of August, 1976, and with the question of appropriate placement for Karlin yet unresolved, the District informed Mr. and Mrs. Moran of its view of Karlin's placement at Bingham for the 1976–1977 school year.

Karlin's assignment for 1976–1977 was made in first instance by the Placement

Committee on the material in her file as of the Spring, 1976. The letter of assignment to the program at Bingham was sent to Mr. and Mrs. Moran August 27, 1976, over the signature of Marjory Farrell. On August 28, 1976, Mr. Moran wrote to Miss Farrell and requested a hearing. On September 3, 1976, Miss Farrell wrote Mr. Moran and advised of an informal conference to take place September 10, 1976 at Bingham. The conference failed of agreement, Mr. and Mrs. Moran requested the statutory hearing, and it was set for October 21, 1976, before Mr. Roitman, directed at Karlin's 1976–1977 placement at Bingham.

Mr. and Mrs. Moran were present with counsel; the District's case was presented by Basil North, attorney for the Department of Special Education. Witnesses were sworn; testimony was taken and transcribed. Mr. and Mrs. Moran presented witnesses Bobbie Wedlan, Mr. Moran and Dr. Norton, and a letter from Miss Farrell listing the I.Q. of children placed under contract between the District and the Joan Davis School. The District presented witnesses Marjory Farrell, Barbara Hankinson, Betty Arnoldy, Dr. Wallace A. Verburg, Richard Norris and Betty Weimer, and correspondence between the parties and other materials in the District's files relating to Karlin Moran. It was agreed that the Hearing Officer would also consider all evidence adduced at the January 6, 1976, hearing. New evidence follows.

Bobbie Wedlan, Karlin's teacher in 1971–1972, was now employed by the Kansas City Lyric Theater. She remembered Karlin not only as possessed of an I.Q. which placed her in EMR, but also as emotionally anxious and with auditory disabilities and perceptual problems. Many of her students had "multiple problems" and 20 children in her classroom had an adverse effect on her ability to deal with them. She discussed Karlin with her parents in 1971–1972, and maintained communication with them the following year when Sandy Reed was her teacher. She suggested they look elsewhere for a program for Karlin because, in her view, the District did not, at the time she was her teacher, have appropriate services for Karlin. She knew nothing of the circumstances of Karlin's assignments for 1975–1976 and 1976–1977.

James Moran voiced his disagreement with his daughter's placement at Bingham. He continued in his desire to keep her enrolled at Joan Davis and in his wish to have the District pay the cost. He did not consider exposure to regular classes in the program at Bingham to be important.

Dr. William Norton, now a psychologist in private practice, and a consultant at Joan Davis, reiterated Karlin's EMR rating. He felt that since coming to Joan Davis she had become able to interact with students and enjoy herself. He provided therapeutic counseling sessions for Karlin's class at Joan Davis; he had no individual sessions with her. He would in some instances go with the idea of "mainstreaming", but remained a proponent of self contained classrooms for special education. He described the ratio of two teachers to ten pupils at Joan Davis, and stated eighteen district children at Joan Davis were receiving financial assistance from the District.

Marjory Farrell stated that children in the District's junior high EMR program have a flexible schedule to suit each child's need and abilities. Participation in regular classes, "mainstreaming", occurs, and should occur as children are ready for it. She recognized that some handicapped children in the District are referred to Joan Davis under contract. Such are children "who have no intensity and/or a multiplicity of problems that would indicate from our information that we would not be able to adequately provide for the child in one of our special educational programs". Eighteen district children were presently under contract to Joan Davis. The District's latest assignment of Karlin Moran to Bingham was based on records including those from Joan Davis furnished by Mr. Moran. The Committee felt its initial decision to be correct. Miss Farrell felt that Karlin's handicap was mental retardation with some minimal learning disability.

Barbara Hankinson was Chairman of the District's Special Education Placement Committee which reviewed Karlin's assignment for the 1976–1977 school year. In addition to Mrs. Hankinson, a specialist in mental handicaps, others on the Committee were Mrs. Weimer, a learning disabilities specialist, Ron Wheeler of the Psychological Services Department, and Virgil Blaine, a Home-School Coordinator. The Committee reviewed the original referral on Karlin for consideration as a special education student, report of the individual psychological testing in 1971 and 1973, evaluation from Menorah Hospital of July 17, 1972, and Joan Davis report of May, 1976. Such materials indicated a history of problems in regular classes and need of special education placement. Her tests showed she functioned in the range of "mentally handicapped" with some indication of auditory perception problems. The Committee's conclusion was placement in a class for educable mentally handicapped with assistance from a learning disabilities teacher. She did not appear to have emotional problems beyond the District's capacity to cope. The Committee was not persuaded by the Joan Davis reports that she should be placed in Joan Davis.

Betty Arnoldy, after reviewing previous materials and Karlin's 1975–1976 year at Joan Davis, felt as did her diagnostic team, that placement at Bingham was best for Karlin.

Dr. Wallace Verburg described individual testing of Karlin Moran done under his supervision and direction. He compared these tests to those done by Menorah and Dr. Norton and concluded that "Educable mentally retarded scores of this nature, repeated scores by different examiners, at different times, years apart, scores this consistent would lead one to believe that this is truly a permanent condition that is not remedial". According to all evaluations, Karlin's records showed her problem as mental retardation, and that the District has programs to meet her need. He felt mainstreaming was of some value at her age, particularly in social development. He agreed with the decision of the diagnostic team and the Placement Committee that an appropriate program was available for Karlin at Bingham.

Richard Norris stated that Bingham houses one class of twenty mentally handicapped students, and it cannot, due to state regulation, exceed that number. Two counsellors work in the program, together with a family services volunteer, and a speech correctionist available one day a week. A learning disabled teacher is also available full time. The EMR classroom is self contained. Additional instruction in music, art, physical education, homemaking and shop is available to qualified individuals under "mainstreaming" guidelines. Some work may be given in regular classes.

Betty Weimer remained in agreement with Karlin's assignment to Bingham, and believed that any handicaps in the nature of learning disability would be treated there due to presence of the learning disabilities teacher.

The Hearing Officer framed the same issues as in the January, 1976 hearing, and found:

(1) That Karlin Moran, complainant's daughter through referral by a school principal, her teacher, and the results of a Stanford-Binet test administered by a school district psychometrist was found to be a handicapped child under Missouri Statute 162.675. In accordance therewith she was assigned to the Special Education program for the EMR at the Marlborough Elementary School.

(2) That after examining reports of evaluations, from the Menorah Medical Center, the evaluation and progress report from the Joan Davis School, the Placement Committee of the Department of Special Education of the Kansas City School District determined there was no disagreement, basically, in the evaluation of the Menorah Medical Center, the Joan Davis School and that of the Kansas City School District.

(3) That the Placement Committee supports the recommendation of Bingham Junior High School as an appropriate school for the education of the mentally retarded, and appropriate for Karlin Moran, with teachers certified by the State of Missouri to teach handicapped, and with facilities and equipment consonant with a quality program.

(4) That expectations for Karlin's educational development is in direct ratio of her Intelligence Quotient to that of children in the normal range of intelligence. With this standard as a criterion Karlin was performing up to expectations in the Kansas City public schools and is performing up to expectations at the Joan Davis School.

(5) That there is no evidence of emotional trauma in Karlin, that there is little to fear if she must change schools at this stage of her development.

(6) That there is little evidence of cerebral dysfunction as alleged by complainant, consequently learning disability is not a handicap connected with the mental retardation of Karlin; that learning disability is not part of the solution to mental retardation; that if learning disability is diagnosed as a problem for Karlin help is available at Bingham Junior High School. (Learning disability was defined as applying to those children within the normal range of intelligence, and the child is not achieving his potential).

(7) That Karlin is reading, within the range of predictions and expectations.

(8) That Karlin would profit by attendance in a Special Education facility of the Kansas City public schools where she would have the advantage of classroom work in hetergeneous groups.

The Hearing Officer again recommended denial of relief sought by Mr. and Mrs. Moran and approval of their daughter's placement at Bingham Junior High School. The Hearing Officer's findings and recommendation were adopted by the Board of Directors of the School District November 15, 1976. Mr. and Mrs. Moran again petitioned for administrative review, the petition was designated CV76–5034, and on January 6, 1977, same was consolidated with CV76–1326. The consolidated case was decided January 26, 1978, by judgment which favored petitioners, Carlyn J. and James J. Moran, and awarded them the sum $6,477.

Appellant District contends the court exceeded the scope of judicial review of the decision of an administrative agency whose findings and decision were supported by competent and substantial evidence on the record. Appellant contends also that the court exceeded its jurisdiction by substituting its own judgment for that of the District on a matter vested by law in the discretion of the District; and that conclusions of law of the court are based on misinterpretations of the law and unsupported factual determinations.

Respondents would support the court in its separate findings and judgment on the theory that this is a case in which the administrative agency erroneously interpreted and applied the law, and the court was not bound by such determination. They assert also that the agency acted arbitrarily and capriciously in its evaluation and assignment of Karlin Moran, in failing to act timely, and in failing to accord her the assignment made for others similarly situated.

As recognized by the parties, the inquiry of the court in review of the District's assignments of Karlin is governed and limited by Rule 100.07 (¶ 536.140 RSMo). In interpretation of this authority, it has been said, *Moore v. Bd. of Ed. of Sp. School Dist. etc.*, 547 S.W.2d 188, 191 (1–4) (Mo.App.1977):

> "The reviewing court may only determine whether the board could reasonably have made its findings and reached its result of whether the decision was clearly contrary to the overwhelming weight of the evidence. * * * The court may not substitute its judgment on the evidence and may not set aside the board's decision

unless it is not supported by competent and substantial evidence on the whole record. In addition, the evidence must be considered in the light most favorable to the board's decision, together with all reasonable inferences which support it. * * *

If the evidence before an administrative body would warrant either of two opposed findings the reviewing court is bound by the administrative determination and it is irrelevant that there is supportive evidence for the contrary finding[s]. * * * Also the determination of the credibility of the witnesses is a function of the administrative tribunal".

See also *Bd. of Education, Mt. Vernon Schools etc. v. Shank*, 542 S.W.2d 779, 781–782 (206) (banc 1976); *Kansas City v. Rooney*, 363 Mo. 902, 254 S.W.2d 626, 628 (banc 1953); *Aubuchon v. Gasconade County R–1 School District*, 541 S.W.2d 322, 326 (Mo.App.1976). It is only where the review does not involve an exercise of administrative discretion, but involves only the application by the agency of the law to the facts, that the court may weigh the evidence for itself and determine the facts accordingly. Rule 100.07(c); *Wolf v. Missouri State Training School for Boys*, 517 S.W.2d 138 (banc 1974); *Central Bank of Clayton v. State Bank Bd. of Mo.*, 509 S.W.2d 175 (Mo.App.1974); *Stephen & Stephen Properties, Inc. v. State Tax Commission*, 499 S.W.2d 798 (Mo.1973).

The statement and evidence demonstrates a case where the administrative agency could reasonably have made the indicated findings and reached its decision with respect to assignment of Karlin Moran to its own program at Bingham Junior High School as opposed to paying tuition for her at a private institution. The testimony of Mr. and Mrs. Moran and witnesses for them in favor of their voluntary placement of Karlin at Joan Davis presented, at best, support for findings opposed to those made by the Board. The court was bound, however, by the findings made by the Board supported as demonstrated by the statement. *Moore v. Bd. of Ed. of Sp. Sch. Dist., etc.*, supra.

Respondents argue that the court's independent findings should be affirmed in that the District failed to meet notice and hearing requirements of ¶¶ 162.670 et seq., failed to provide the services to Karlin there mandated, and deprived Karlin of equal protection of the law in its refusal to assign her to Joan Davis.

There was some difficulty with respect to notice and time of the first hearing. It is not shown, however, how that affected Karlin's interests adversely. A hearing on her placement for the year 1975–1976 was accorded, and a timely hearing was accorded on her placement for the year 1976–1977.

Both resulted in approval of assignments to Bingham Junior High School, and the evidence, as demonstrated by the statement, supports such assignments. Mr. and Mrs. Moran chose to disagree with such assignments and voluntarily withdrew Karlin from Bingham and placed her at Joan Davis. Fortunately for Karlin, it appears that Joan Davis also provides adequately for her needs; and Mr. and Mrs. Moran are entitled to enroll their child in such an approved private school. They may not, however, cast the burden of their tuition at Joan Davis on the District on their disagreement and preference alone.

The argument that the District failed to provide services mandated by law for Karlin ignores the evidence in support of the Board's findings and decisions.

The argument of denial of equal protection is also made in disregard of the evidence in support of Karlin's assignments to Bingham. Both the law and the evidence recognize that evaluation and assignments of children for the purpose of ¶¶ 162.670 et seq. are made to meet the needs of individual children; and the evidence shows the assignments made for Karlin to be consistent with the public policy of ¶ 162.670 et seq. Maintenance of other children at Joan Davis does not require the same assignment for Karlin where the evidence supports her assignment to Bingham.

Judgment reversed.

All concur.